UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

---

BENNETT LEISER, on behalf of himself and
all others similarly-situated,

                Plaintiff,

vs.

BMW AG, BMW OF NORTH AMERICA,
LLC, VOLKSWAGEN AG, VOLKSWAGEN
GROUP OF AMERICA, INC., AUDI AG,
AUDI OF AMERICA, INC., AUDI OF
AMERICA, LLC, DR. ING. H.C. F.
PORSCHE AG, PORSCHE CARS NORTH
AMERICA, INC., BENTLEY MOTORS
LIMITED, DAIMLER AG, MERCEDES-
BENZ USA, LLC and MERCEDES-BENZ
U.S. INTERNATIONAL,

                Defendants

Case No.:

JURY TRIAL REQUESTED

---

## CLASS ACTION COMPLAINT

### INTRODUCTION

1.  This case follows stunning revelations of a decades-long conspiracy where the "German Five" carmakers held themselves out to be fierce competitors, but in reality were functioning as divisions of a single massive company, agreeing on nearly every aspect of the creation of their cars, unbeknownst to the millions of consumers who thought they were the beneficiaries of innovation and competition.

2.  Through thousands of meetings and constant communication between hundreds of employees, Audi, BMW, Daimler (parent of Mercedes), Porsche and Volkswagen (defined below) conspired not to compete on innovation, and worked together to keep it all secret. The

details of the conspiracy are as shocking in breadth as the conspiracy was in duration.

3.      The effects of this conspiracy have been – and continue to be – felt across the world. Countless millions of cars manufactured by the Defendants (as defined below) from 1990 to the present ("German Cars") were sold and billions of dollars in commerce was spent on vehicles that were not what they were held out to be. Where consumers thought they were paying top dollar for independent design and quality research and development, they were in fact paying for largely uniform and overpriced cars that, absent collusion, would have had more features, been faster, more efficient, less environmentally damaging, and less expensive.

4.      The question is not one of existence of a conspiracy, but rather its scope. Daimler and Volkswagen have already admitted their wrongdoing to competition authorities – now the investigation is only a matter of determining how many billions of dollars were deceitfully taken from loyal car customers and how to fix an entire country's most important industry. Evidence regarding the roles of Volkswagen, Daimler, BMW, Porsche and Audi continue to emerge.

## JURISDICTION AND VENUE

5.      This Court has original federal question jurisdiction over the Sherman Antitrust Act claim asserted in this Court, pursuant to 28 U.S.C. §§1331 and 1337, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26. This Court also has jurisdiction over this case pursuant to 28 U.S.C. §1332(d) and the Class Action Fairness Act of 2005 ("CAFA") (28 U.S.C. §1711, *et seq.*), which vests original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds $5 million and where the citizenship of any member of the class of plaintiffs is different from that of any defendant. The $5 million amount in controversy and diverse citizenship requirements of CAFA are satisfied in this case.

6.     Venue is proper in this District pursuant to §12 of the Clayton Act (15 U.S.C. §22), and 28 U.S.C. §§1391(b)-(d), because a substantial part of the events giving rise to plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants resides in, is licensed to do business in, is doing business in, had agents in, or is found or transacts business in, this District.

7.     This Court has personal jurisdiction over each of the Defendants because, *inter alia*, each of the Defendants: (a) transacted business throughout the United States, including in this District; (b) marketed and sold German Cars throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an illegal conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

8.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

## THE PARTIES

### Plaintiff

9.     Plaintiff Bennett Leiser is a resident of Palm Beach County, Florida. He purchased or leased one or more new German Cars during the relevant Class Period not for resale, which was manufactured or sold by a Defendant.

### Volkswagen Defendants

10.     Defendant Volkswagen AG is a German corporation with its principal place of

business in Wolfsburg, Germany. Volkswagen AG is the parent company of Volkswagen Group of America, Inc., Audi AG, Porsche AG, Bugatti, Lamborghini, Ducati and Bentley. In 2016, Volkswagen AG was the largest auto manufacturer in the world. Volkswagen AG's sales revenue for 2016 was over $217 billion. Through a chain of distributors and dealer in the United States, Volkswagen AG continuously advertised, marketed and sold Volkswagen vehicles, and vehicles of Volkswagen's subsidiaries, throughout the United States, including in this District, during the period from January 1, 1990 to the present (the "Class Period"). The vehicles are shipped overseas to the United States, offloaded in American ports, and distributed to a network of dealers via truck and rail across state borders throughout the United States.

11.    Defendant Volkswagen Group of America, Inc. (together with Volkswagen AG, "Volkswagen" or the "Volkswagen Defendants") is incorporated in New Jersey, does business in all fifty states and the District of Columbia, has regional offices in Woodcliff Lake, New Jersey, and its principal place of business is in Herndon, Virginia. Volkswagen Group of America, Inc. continuously advertised, marketed, leased, and sold Volkswagen vehicles, and vehicles of Volkswagen's subsidiaries, throughout the United States, including in this District, during the Class Period.

12.    The Volkswagen Defendants designed the vehicles at issue in this action with the specific intent to sell them in the United States and with the supposed ability to meet U.S. and California emissions requirements.

13.    According to the Volkswagen Group of America, Inc. website, "VW Credit, Inc. (VCI) is a wholly owned subsidiary of Volkswagen Group of America, Inc. As a captive finance company, VCI serves our U.S. retail customers and dealers as Volkswagen Credit, Audi Financial Services, and Bentley Financial Services." VCI's headquarters is at the Volkswagen

Group of America, Inc. offices in Herndon, Virginia, with regional field offices in Pleasant Prairie, Wisconsin, Woodcliff Lake, New Jersey, Westlake Village, California, and Alpharetta, Georgia.

14.     Upon information and belief, Volkswagen AG avails itself of the laws and protections of the United States by providing lending, leasing, insurance and billing services for the vehicles at issue sold and leased through its wholly owned subsidiaries Volkswagen Group of America, Inc. and VW Credit, Inc., throughout all 50 of the United States, including in this District.

### Bentley (Volkswagen Defendant)

15.     Bentley Motors Limited ("Bentley") is organized under the laws of the United Kingdom. Bentley has been a subsidiary of Volkswagen AG since 1998. In 2012, Bentley moved its U.S. headquarters to the offices of Volkswagen Group of America, Inc. in Herndon, Virginia. Prior to this change, Bentley was headquartered in Boston, Massachusetts. Bentley designs, develops, manufactures and sells the vehicles at issue purchased throughout the United States, including in this District, during the Class Period. The vehicles are shipped overseas to the United States, offloaded in American ports, and distributed to a network of 58 dealers via truck and rail across state borders throughout the United States.

16.     Bentley designed the vehicles at issue in this action with specific intent to sell them in the United States and with the supposed ability to meet U.S. and California emissions requirements.

### Porsche Defendants (Volkswagen Defendant)

17.     Defendant Dr. Ing. h.c. F. Porsche AG ("Porsche AG") is a German corporation with its principal place of business located in Stuttgart, Germany. Porsche AG is a wholly-owned subsidiary of Volkswagen AG. Porsche AG designs, develops, manufactures,

leases and sells the vehicles at issue purchased throughout the United States, including in this District, during the Class Period.

18.     Defendant Porsche Cars North America, Inc. (together with Porsche AG, "Porsche" or the "Porsche Defendants") is incorporated in Delaware with its principal place of business in Georgia. Porsche Cars North America, Inc. is a wholly-owned U.S. subsidiary of Porsche AG and advertises, markets, leases and sells vehicles in all fifty states. Porsche Cars North America, Inc. ships the vehicles overseas to the United States where they are offloaded in American ports and distributed to a network of 189 dealers via truck and rail across state borders throughout the United States.

19.     The Porsche Defendants designed the vehicles at issue in this action with the specific intent to sell them in the United States and with the supposed ability to meet U.S. and California emissions requirements.

**Audi Defendants**

20.     Defendant Audi AG is a German corporation with its principal place of business in Ingolstadt, Germany. Audi AG is the parent company of Audi of America, Inc. and Audi of America, LLC (together, "Audi" or the "Audi Defendants") and also is a wholly owned subsidiary of Volkswagen AG. Audi AG designs, develops, manufactures, leases and sells the vehicles at issue that were purchased throughout the United States, including this District, during the Class Period. Audi AG directs the activities of its subsidiaries, which act as its agents selling vehicles throughout the United States. The vehicles are shipped overseas to the United States, offloaded in American ports, and distributed to a network of dealers via truck and rail across state borders throughout the United States.

21.     Defendant Audi of America, Inc. is incorporated in New Jersey, does business

in all fifty states and the District of Columbia, has regional offices in Woodcliff Lake, New Jersey, and its principal place of business is in Herndon, Virginia. During the Class Period, Audi of America, Inc. was continuously doing business through a chain of distributors and dealers in the United States, including within this District, by advertising, promoting, distributing, leasing and selling Audi cars.

22.     Defendant Audi of America, LLC is incorporated in Delaware, and does business in all fifty states and the District of Columbia, and its principal place of business is in Herndon, Virginia. During the Class Period, Audi of America, LLC was continuously doing business in the United States, including advertising, promoting, leasing and selling Audi automobiles.

23.     The Audi Defendants designed the vehicles at issue in this action with the specific intent to sell them in the United States and with the supposed ability to meet U.S. and California emissions requirements.

**Daimler Defendants**

24.     Defendant Daimler AG ("Daimler") is a foreign corporation headquartered in Stuttgart, Baden-Württemberg, Germany.  Daimler designs, engineers, manufactures, tests, markets, supplies, sells, leases and distributes the vehicles at issue that were leased and purchased throughout the United States, including in this District, during the Class Period. The vehicles are shipped overseas to the United States, offloaded in American ports, and distributed to a network of dealers via truck and rail across state borders throughout the United States.

25.     Daimler is the parent company of Mercedes-Benz USA, LLC and controls this subsidiary, which acts as the sole distributor for Mercedes-Benz vehicles in the United States. Daimler owns 100% of the capital share in Mercedes- Benz USA, LLC.

26.     Daimler designed the vehicles at issue in this action with the specific intent to sell them in the United States and with the supposed ability to meet U.S. and California emissions requirements.

27.     Upon information and belief, Daimler avails itself of the laws and protections of the United States by providing lending, leasing, insurance and billing services for the vehicles at issue sold and leased throughout all 50 of the United States, including in this District, through its wholly owned subsidiaries, Daimler Financial Services and Mercedes-Benz Financial Services. In addition, Mercedes- Benz Financial Services issues consumer credit cards offering Mercedes-Benz-related rewards and benefits.

### Mercedes (Daimler Defendant)

28.     Defendant Mercedes-Benz USA, LLC (together with Mercedes-Benz U.S. International, Inc. and Mercedes-Benz Vans, LLC, "Mercedes" or the "Mercedes Defendants") is a Delaware limited liability corporation with its principal place of business in Atlanta, Georgia. Mercedes-Benz USA, LLC operates a regional sales office, a parts distribution center, and a customer service center in New Jersey. Mercedes designs, manufactures, markets, distributes, sells and leases the vehicles at issue that were purchased throughout the United States, including in this District, during the Class Period. The vehicles are shipped overseas to the United States, offloaded in American ports, and distributed to a network of dealers via truck and rail across state borders throughout the United States.

29.     Defendant Mercedes-Benz U.S. International, Inc. is a corporation organized and existing under the laws of Alabama, with its principal place of business in Vance, Alabama. Mercedes-Benz U.S. International, Inc. is a wholly- owned subsidiary of Daimler.

30.     Defendant Mercedes-Benz Vans, LLC is a Delaware limited liability corporation with its principal place of business in Ladson, South Carolina. Mercedes-Benz Vans, LLC is a wholly-owned U.S. subsidiary of Daimler AG.

31.     The Mercedes Defendants designed the vehicles at issue in this action with the specific intent to sell them in the United States and with the supposed ability to meet U.S. and California emissions requirements.

### BMW Defendants

32.     Defendant BMW AG (Bayerische Motoren Werke AG) is a German holding company and vehicle manufacturer. BMW AG is headquartered in Germany. BMW AG, together with its subsidiaries, develops, manufactures, leases and sells cars and motorcycles worldwide, including the vehicles at issue that were purchased and leased throughout the United States, including in this District, during the Class Period. The vehicles are shipped overseas to the United States, offloaded in American ports, and distributed to a network of dealers via truck and rail across state borders throughout the United States. In 2016, BMW AG had revenue of €94.16 billion (approximately $110 billion), with earnings before interest and taxes (EBIT) of €9.39 billion (approximately $11 billion).

33.     Defendant BMW North America, LLC (together with BMW AG, "BMW" or the "BMW Defendants") is a Delaware limited liability corporation with its principal places of business in Woodcliff Lake, New Jersey, including its corporate headquarters, Eastern Regional Headquarters, Technical Training Center. BMW of North America, LLC is the U.S. importer of BMW vehicles, including motorcycles, small trucks and the vehicles at issue in this action.

34.     Upon information and belief, BMW AG avails itself of the laws and protections of the United States by providing lending, leasing, insurance and billing services for

the vehicles at issue sold and leased throughout all 50 of the United States, including in this District, through its wholly owned subsidiary, BMW Group Financial Services, which "contributes roughly 20% of the BMW Group's total profit." In addition, BMW Group Financial Services issues consumer credit cards offering BMW-related rewards and benefits.

35.     All of the parties listed above as defendants are collectively referred to herein as "Defendants".

## AGENTS AND CO-CONSPIRATORS

### Bosch Co-Conspirators

36.     Robert Bosch GmbH (together with Robert Bosch LLC, "Bosch") is a German multinational engineering and electronics company headquartered in Gerlingen, Germany. Robert Bosch GmbH, directly and/or through its North American subsidiary, Robert Bosch LLC, designs, develops, manufactures and supplies automotive parts and technology.

37.     Robert Bosch LLC is a Delaware limited liability company with its principal place of business in Farmington Hills, Michigan. Robert Bosch LLC is wholly owned and controlled by Robert Bosch GmbH. Robert Bosch LLC worked in conjunction with its parent company – Robert Bosch GmbH – to design, manufacture, develop and supply automotive parts and technology to the Defendants for use in the vehicles at issue.

38.     Upon information and belief, Bosch was the preferred supplier of the German automaker cartel. As described in this complaint, Bosch was a central player in the creation of the illegal diesel defeat device and possessed knowledge of the collusion to limit the volume of AdBlue tanks at least as early as October 2006.

### IAV Co-Conspirators

39.     IAV GmbH is a private limited company headquartered in Berlin,

Germany. IAV GmbH is an engineering company in the automotive industry, which designs products for powertrain, electronics and vehicle development. Volkswagen is an IAV GmbH client, owning a controlling share of IAV GmbH's stock.

40.    IAV Automotive Engineering Inc. (together, with IAV GmbH, "IAV") is a subsidiary of IAV GmbH with a principal place of business in Northville, Michigan.

41.    Upon information and belief, IAV employees were members of a working group that included Bosch and Volkswagen, possessing a common purpose of creating and installing defeat devices in U.S.-based diesel Volkswagens, Audis and Porsches.

42.    The United States Department of Justice is, or has been, investigating IAV's role in the dieselgate emissions scandal as a possible co-conspirator with Volkswagen and Bosch. The German Prosecutor's fraud investigation also included raids directed at IAV.

### VDA Co-Conspirators

43.    On information and belief, at all relevant times, other entities and/or persons, including but not limited to the VDA (Verband der Automoilindustrie), willingly conspired with the Defendants in their unlawful restraint of trade. All averments herein against Defendants are also against these unnamed co-conspirators.

44.    The VDA is an "eingetragener Verein," or registered association or incorporated association, with its headquarters in Berlin, Germany. The VDA consists of more than 620 companies associated with the German auto industry. The VDA has three manufacturer groups: automobile manufacturers, automotive suppliers, and companies making trailers, special bodies, and buses.

45.    The VDA currently has approximately 35 working groups, or Arbeitskreise, some of which have sub-committees or ad hoc working groups. The VDA working groups possess a common purpose, with the majority of the working groups having members

from all three manufacturer groups. Examples of working groups include: Working Group for Container Standardization; Aftermarket Committee; Working Group of Manufacturer Group II; Working Group for CAD/CAM; Working Group Digital Factory; Working Group for Trade of Manufacturer Group III; Working Group for Electrical Engineering; Working Group for Refrigerants; Press Committee; Raw Materials Committee; Legal Committee; and Committee for Technology, Safety and the Environment, and others.

46.     Upon information and belief, such VDA working group meetings were opportunities for Defendants to collude, conspire and agree to constrain innovation, limit expenditures, and/or select preferred suppliers, further limiting competition among providers of parts and technology. These group meetings were occasions to share commercially competitive information, including prices, expenses and technology.

47.     As evidence, senior management from the German automakers met on June 15, 2009. They conferred about creating infrastructure in Europe to service AdBlue tanks under the leadership of the VDA.

48.     On information and belief, plaintiff believes that there are additional agents and co-conspirators who were complicit in and acted in furtherance of the activities alleged in this complaint and that discovery will reveal their identity and the extent of their cooperation.

## FACTUAL ALLEGATIONS

### The German Automakers' Conspiracy

49.     The German Five have been colluding for more than two decades, holding themselves out as competitors while charging supracompetitive prices for supposed German innovation and quality. They effected the conspiracy by restricting technological innovation, agreeing to use parts of lesser quality and/or effectiveness and by agreeing to cede any

competitive advantage that may have been gained through competition for the greater (illegal) good of the group.

50. According to an article released by *Der Spiegel*, a German news magazine famous for its investigative reporting, the German Five coordinated their activities in more than one thousand meetings involving hundreds of employees, with coordination between the Five frequently more effective than that among various departments within a single company. *Der Spiegel's* investigation concluded that the "agreements among the German automakers likely constitute one of the biggest cartel cases in German industrial history."

51. Based on information provided to competition authorities by VW, the article details regular meetings between the auto companies "several times a year" in cities across Germany, from Stuttgart to Munich, Ingolstadt to Wolfsburg. VW's submission also contained an admission that there was suspicion that there was "behavior in violation of cartel law."

52. One example of the wide-ranging nature of the conspiracy is that the carmakers refused to compete on the speed at which a car could be traveling and operate a convertible top. Rather than offer customers options in a competitive marketplace, the companies colluded down to the very last detail, agreeing there would be "no arms race when it comes to speeds." That the German Five would collude on such a minor feature of a car indicates the severity and pervasiveness of their commitment to not competing.

53. Another example of the severity of the conspiracy is the German Five's collusion on the technology for treating diesel emissions in their cars. In the mid- 2000s, concern for carbon dioxide in the atmosphere, and concomitant carbon dioxide governmental regulations on the auto industry, caused car companies to begin to compete by manufacturing cleaner cars. By that time, Japanese carmakers had invented hybrid cars, which emitted less carbon dioxide than traditional cars. The German Five agreed to "compete" for the clean car

market by all using diesel, which releases less carbon dioxide into the atmosphere at the expense of releasing nitric oxide. But this race to compete with Japanese carmakers' hybrid gasoline-electric engines did not result in competition among Defendants, rather, in a meeting on April 5, 2006, in Sindelfingen they agreed to come up with a "coordinated approach" to emissions strategy through the use of their many working groups.

54.     At various subsequent meetings, the five Defendants coordinated the size of tanks for AdBlue, a urea mixture used to split nitric oxide into its harmless components of water and nitrogen. Larger tanks would have been more expensive, so Daimler, BMW, Audi and VW agreed to use smaller tanks. Unfortunately, this agreement resulted in the tanks not being able to neutralize the amount of pollution that was required by law, so the manufacturers had to collude additionally on ways to cheat emissions testing. This scandal was uncovered and resulted in "Dieselgate," which as detailed in this complaint, cost VW billions and is now affecting Daimler who is under investigation and has recalled millions of cars for software updates related to emissions. According to VW's plea agreement with the government over Dieselgate, this facet of the conspiracy was aided by IAV, the supplier who designed the tanks with knowledge of the defeat devices for the car companies, and who was complicit with VW in destroying incriminating documents relating to U.S. emissions issues, after VW was contacted and told to preserve documents.

55.     These examples are illustrative of the illegal agreements and close connections and working relationships that pervade the German Car industry, which enabled the collusion alleged in this complaint.

### Government Investigations into Collusion in the German Car Industry

56.     On July 22, 2017, the European Commission ("EC") announced that it was investigating allegations of an antitrust cartel among a group of major German car

manufacturers, including defendants Volkswagen, BMW, Audi, Porsche and Daimler.

57.     This investigation is in parallel with an investigation by the German antitrust authority, the Bundeskartellamt, which has confirmed that it received information from the Defendants that may relate to the operation of an antitrust cartel dating back to as early as the 1990s. As part of its investigation, the EC has already confiscated documents from Defendants and interviewed witnesses in connection with the alleged cartel.

58.     According to reports, this investigation was launched after Daimler came forward, admitting participation in an antitrust conspiracy in exchange for total immunity. In order to obtain total immunity under the leniency policy, a company that participated in a cartel must be the first one to inform the EC of an undetected cartel by providing sufficient information to allow the EC to launch an inspection at the premises of the companies allegedly involved in the cartel. If the EC is already in possession of enough information to launch an inspection or has already undertaken one, the company must provide evidence that enables the EC to prove the cartel infringement.

59.     It has also been reported that Volkswagen has applied for leniency by coming forward and admitting to being involved in an antitrust conspiracy in exchange for up to 50% off any potential fines.

60.     According to Volkswagen's admissions to German and European Union ("EU") antitrust officials, Defendants entered into potentially unlawful agreements through 60 industry committees made up of approximately 200 employees who discussed vehicle development, brakes, gasoline and diesel engines, clutches and transmissions, as well as exhaust treatment systems.

61.     On July 25, 2017, it was reported that the U.S. Department of Justice ("DOJ")

Antitrust Division was reviewing allegations that German carmakers had colluded.

## Defendants Are Recidivist Violators of U.S. Laws

62.     In recent years, the automotive industry has been rattled by a wave of scandals involving various schemes by major automobile manufacturers to evade U.S. laws. In particular, defendants Volkswagen and Daimler have been found to have lied about the cleanliness of diesel fuel in a scandal referred to as "Dieselgate," costing the companies tens of billions of dollars in criminal fines, civil restitution and settlements. As part of this investigation, German prosecutors investigated Bosch employees suspected of helping Volkswagen rig software to cheat on emissions tests.

63.     Volkswagen pleaded guilty to using emissions testing "defeat device software" to lie and mislead the Environmental Protection Agency ("EPA") and U.S. consumers regarding the environmental friendliness of their "clean" vehicles. Volkswagen paid over $20 billion in civil and criminal penalties for deploying the "defeat device" to cheat emissions compliance regulations. *See In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litig.*, No. 3:15- md-2672 CRB (JSC) (N.D. Cal. 2015) (settlement of $14.7 billion for the consumer class); *United States v. Volkswagen AG*, No. 16-cr-20394 (E.D. Mich. 2016) (settlement with DOJ for $4.3 billion). Berlin-based IAV GmbH, a company that's 50% owned by Volkswagen, is mentioned in the statement of facts as a possible co-conspirator. There is currently a class action pending against Mercedes for similar conduct, *Lynevych v. Mercedes-Benz USA, LLC*, No. 2:16cv881 (D.N.J. 2016).

64.     Massive litigation is ongoing in *In re Automotive Parts Antitrust Litigation*, No. 12-md-02311 (E.D. Mich.). That action, which consolidated cases against numerous defendants related to multiple automotive parts, alleges wide-spread conspiracies by various parts

makers.    The cases allege illegal acts in the market for shock absorbers, exhaust systems, automotive bearings, power window switches, brake hoses, ignition coils and many more components. That litigation has resulted in settlements of more than $600 million to date, with a number of cases still being actively litigated.

65.      In 2016, European truck makers MAN, Daimler, DAF, Iveco, and Volvo-Renault were revealed to be involved in a truck price-fixing scandal. All except Volkswagen-owned MAN paid record fines, which Volkswagen avoided paying by being the first participant in the illegal cartel to bring the unlawful conduct to regulators' attention. Daimler paid over $1 billion in fines to the EC for its role in this price-fixing conspiracy.

### The Structure and Characteristics of the
### German Car Market Renders the Conspiracy More Plausible

66.      The structure and other characteristics of the German car market in the United States are conducive to collusion. Specifically, the German car market: (1) has high barriers to entry; (2) has inelasticity of demand; and (3) is highly concentrated.

### The German Car Market Has High Barriers to Entry

67.      A collusive arrangement that lower costs for manufacturers while simultaneously increasing the price of the product to consumers would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.   Where, however, there are significant barriers to entry, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

68.      There are substantial barriers that preclude, reduce or make more difficult entry into the German car market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and longstanding

customer relationships.

### There Is Inelasticity of Demand for German Cars

69.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite price increases.

70.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchase substitute products or decline to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

71.     Demand for German cars is highly inelastic because there are no close substitutes for these products.

### The Market for German Cars Is Highly Concentrated

72.     A highly concentrated market is more susceptible to collusion and other anticompetitive practices.

73.     The Defendants make up 100% of the German car market.

74.     In 2016, Daimler reported €89.284 billion in revenue for its Mercedes-Benz Cars division, which is largely comprised of German Cars.

75.     In 2016, BMW reported €86.424 billion in revenue for its automotive division, which is comprised of BMW, Mini and Rolls-Royce vehicle sales. BMW vehicles comprised the

majority (83%) of those sales.

76.     In 2016, Volkswagen reported €105.651 billion in revenue for its VW passenger car division, €59.317 billion for its Audi division, and €22.318 billion for its Porsche division.

77.     Capital requirements and technological changes make the German car market difficult for new entrants generally. The collusion over Defendants' vehicles, costs, suppliers and markets increases the barriers to entry for new auto manufacturers.

78.     Volkswagen owns both Audi and Porsche and in 2016 was the largest vehicle manufacturer in the world.

## CLASS ACTION ALLEGATIONS

79.     Plaintiff brings this action on behalf of himself and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Injunctive Class"):

> All persons and entities who, during the Class Period, purchased or leased a new German Car in the United States not for resale, which was manufactured or sold by a Defendant.

80.     Plaintiff also brings this action on behalf of himself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages on behalf of a nationwide class pursuant to California state antitrust, unfair competition, and consumer protection law on behalf of the following class (the "Nationwide Class"):

> All persons and entities who, during the Class Period, purchased or leased a new German Car in the United States not for resale, which was manufactured or sold by a Defendant.

81.     To the extent damages are allowed by law beyond those in the Nationwide Class, or the Nationwide Class is narrowed, plaintiff also brings this action alleging violations of the antitrust/consumer protection statutes in Counts II-IV on behalf of state classes of German

Car purchasers who are residents of each of the varying states in Counts II-IV who purchased a German Car in the United States not for resale, which was manufactured or sold by a Defendant (the "Damages Classes").

82.     Excluded from the Classes are the Defendants, their parents, subsidiaries and affiliates, Defendants' attorneys, co-conspirators, governmental entities and all persons or entities who purchased a German Car for resale.

83.     While plaintiff does not know the exact number of the members of the Classes, plaintiff believes there are at least hundreds of thousands of members in each Class.

84.     Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was applicable to all members of the Classes, thereby making relief appropriate with respect to the Classes as a whole. Questions of law and fact common to the Classes include, but are not limited to:

(a)     Whether Defendants agreed not to compete on the manufacture of several components of German Cars;

(b)     The identify and participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated the Sherman Act;

(e)     Whether the alleged conspiracy violated various states antitrust and consumer protection statutes;

(f)     Whether Defendants' conduct caused injury to the business or property of plaintiff and members of the Classes;

(g)     Whether and to what extent Defendants concealed their wrongdoing;

(h)      The effect of the alleged conspiracy on the prices of German Cars sold in the United States during the Class Period;

(i)      The appropriate injunctive relief for the Injunctive, Nationwide and State Damages Classes; and

(j)      The appropriate class-wide measure of damages for the Nationwide and State Damages Classes.

85.      Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust, consumer protection and class action litigation.

86.      The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

87.      Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

88.      The prosecution of separate actions by individual members of the Classes

would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## FRAUDULENT CONCEALMENT

89.     Plaintiff and the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until July 21, 2017, when *Der Spiegel* published an article announcing the details of the wide-ranging German Car conspiracy. Plaintiff and the Classes were unaware of Defendants' unlawful conduct and had no reason to believe they were buying inferior German Cars at inflated prices throughout the United States during the Class Period before the *Der Spiegel* article ran.  No information regarding the conspiracy detailed in this complaint was available to plaintiff or the Classes either publicly or through the relationships plaintiff and the Classes had with the dealers from whom they purchased German Cars.

90.     As detailed in this complaint, Defendants affirmatively acted to conceal the conspiracy in order to avoid detection through the use of covert meetings, working groups, and the use of other pretexts to mask the true purpose of their collusive communications.

91.     Thus, until July 21, 2017, when the public became aware of the conduct alleged in this complaint, the statute of limitations had not begun to run.

## COUNT I

### Violation of §§1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 3, Agreement Restraining Trade

92.     Plaintiff hereby incorporates the allegations in this complaint as though fully set forth herein.

93.     Defendants and their co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of §§1 and 3 of the Sherman Antitrust Act,

15 U.S.C. §§1 and 3. The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants agreed not to compete on innovation and agreed to hold themselves out as if they were competing with the intent and effect of bolstering prices at supracompetitive levels.

94.     Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between, and among Defendants and other unnamed co-conspirators. Defendants' conspiracy is a *per se* violation of the Sherman Antitrust Act and is, in any event, an unreasonable and unlawful restraint of trade for which there is no legitimate business justification, and if any pro-competitive benefits were caused by Defendants' actions, those benefits were outweighed by the anti-competitive effects of Defendants' unreasonable restraint of trade. Any ostensible pro-competitive benefit was pretextual or could have been achieved by less restrictive means.

95.     Defendants' conspiracy, and the resulting impact on the prices of German Cars, occurred in and affected interstate commerce and commerce in and between the territories of the United States.

96.     As a direct, intended, foreseeable and proximate result of Defendants' conspiracy and overt acts taken in furtherance thereof, plaintiff and each member of the Classes have suffered injury to their business or property. Plaintiff's and each Class member's damages are directly attributable to Defendants' conduct, which resulted in all Class members paying higher prices for lesser German Cars during the Class Period than they would have otherwise paid, but for Defendants' agreement.

97.     Plaintiff's and the Classes' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

98.     Plaintiff and the Classes are entitled to an injunction to halt the illegal behavior, attorneys' fees, reasonable expenses, and cost of suit for the violations of the Sherman Antitrust Act.

## COUNT II
### Violation of State Antitrust Statutes

99.     Plaintiff hereby incorporates the allegations in this complaint as though fully set forth herein.

100.    **Arizona.** Plaintiff further alleges as follows:

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in Arizona.

(b)     Defendants' combinations or conspiracies had the following effects: (1) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; and (2) Arizona purchasers paid supracompetitive, artificially inflated prices for German Cars.

(c)     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(d)     As a direct and proximate result of Defendants' unlawful conduct, Arizona purchasers have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §44-1401, *et seq*. Accordingly, Arizona purchasers seek all forms of relief available under Ariz. Rev. Stat. §44-1401, *et seq*.[1]

---

[1] In compliance with Arizona's Antitrust Act, Ariz. Rev. Stat. §44-1415, plaintiff gave notice of this

101.    **California**.  Plaintiff further alleges as follows:

(a)    Beginning at a time presently unknown to plaintiff, but at least as early as 1997, and continuing thereafter to the present, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of §16720 of the California Business and Professions Code ("§16720").  Defendants, and each of them, have acted in violation of §16720 to fix, raise, stabilize and maintain prices of German Cars at supracompetitive levels.

(b)    The violations alleged in this complaint of §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of German Cars.

(c)    For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following: fixing, raising, stabilizing and/or maintaining the price of German Cars.

(d)    The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition in the sale of German Cars has been restrained, suppressed and/or eliminated in the State of California; (2) prices for German Cars sold by Defendants and their co-conspirators have been fixed, raised, maintained in the State of California; and (3) those who purchased German Cars directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

---

complaint to the Arizona Attorney General on or about the date of filing.

(e)     As a direct and proximate result of Defendants' unlawful conduct, plaintiff and California purchasers have been injured in their business and property in that they paid more for German Cars than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of §16720, *et seq.* of the California Business and Professions Code, plaintiff and the California purchasers seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to §16750(a) of the California Business and Professions Code.

102.     **District of Columbia**. Plaintiff further alleges as follows:

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold, distributed or obtained in the District of Columbia.

(b)     Defendants' combinations or conspiracies had the following effects: (1) price competition was restrained, suppressed and eliminated throughout the District of Columbia; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; and (3) District of Columbia purchasers paid supracompetitive, artificially inflated prices for German Cars.

(c)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(d)     As a direct and proximate result of Defendants' unlawful conduct, District of Columbia purchasers have been injured in their business and property and are threatened with further injury

(e)     By reason of the foregoing, Defendants have entered into agreements

in restraint of trade in violation of D.C. Code §28-4501, *et seq*. Accordingly, District of Columbia purchasers seek all forms of relief available under D.C. Code §28-4501, *et seq*.

103. **Hawaii.**    Plaintiff further alleges as follows:

(a)    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold, distributed or obtained in Hawaii.

(b)    Defendants' combinations or conspiracies had the following effects: (1) price competition was restrained, suppressed and eliminated throughout Hawaii; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout Hawaii; (3) Hawaii purchasers paid supracompetitive, artificially inflated prices for German Cars.

(c)    During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

(d)    As a direct and proximate result of Defendants' unlawful conduct, Hawaii purchasers have been injured in their business and property and are threatened with further injury.

(e)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Code, Haw. Rev. Stat. §480-4. Accordingly, Hawaii purchasers seek all forms of relief available under Hawaii Code, Haw. Rev. Stat. §480-1, *et seq*.[2]

106. **Iowa**. Plaintiff further alleges as follows:

(a)    Defendants agreed to, and did in fact, act in restraint of trade or

---

[2] In compliance with Haw. Rev. Stat. §480-13.3, plaintiff gave notice of this complaint to the Hawaii Attorney General on or about the date of filing.

commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in Iowa.

(b)     Defendants' combinations or conspiracies had the following effects: (1) German Car price competition was restrained, suppressed and eliminated throughout the Iowa; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout the Iowa; and (3) Iowa purchasers paid supracompetitive, artificially inflated prices for German Cars.

(c)     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(d)     As a direct and proximate result of Defendants' unlawful conduct, Iowa purchasers have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §553.1, *et seq*. Accordingly, Iowa purchasers seek all forms of relief available under Iowa Code §553.1, *et seq*.

107.     **Kansas**. Plaintiff further alleges as follows:

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in Kansas.

(b)     Defendants' combinations or conspiracies had the following effects: (1) German Car price competition was restrained, suppressed and eliminated throughout Kansas; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; and (3) Kansas purchasers paid supracompetitive, artificially inflated prices

for German Cars.

(c)     During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(d)     As a direct and proximate result of Defendants' unlawful conduct, Kansas purchasers have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kan. Stat. §50-101, *et seq*. Accordingly, Kansas purchasers seek all forms of relief available under Kan. Stat.

§50-101, *et seq*.

108.     **Maine**.  Plaintiff further alleges as follows:

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in Maine.

(b)     Defendants' combinations or conspiracies had the following effects: (1) German Car price competition was restrained, suppressed and eliminated throughout Maine; (2) German Car prices were raised, fixed, maintained  and stabilized at artificially high levels throughout Maine; and (3) Maine purchasers paid supracompetitive, artificially inflated prices for German Cars.

(c)     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(d)     As a direct and proximate result of Defendants' unlawful conduct, Maine purchasers have been injured in their business and property and are threatened with further

injury.

(e)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Me. Rev. Stat. tit. 10, §1101, *et seq.* Accordingly, Maine purchasers seek all forms of relief available under Mr. Rev. Stat. tit. 10, §1101 *et seq.*

109.    **Michigan**. Plaintiff further alleges as follows:

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in Michigan.

(b)      Defendants' combinations or conspiracies had the following effects: (1) German Car price competition was restrained, suppressed and eliminated throughout Michigan; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; and (3) Michigan purchasers paid supracompetitive, artificially inflated prices for German Cars.

(c)      During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(d)      As a direct and proximate result of Defendants' unlawful conduct, Michigan purchasers have been injured in their business and property and are threatened with further injury.

(e)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mich. Comp. Laws §445.771, *et seq.* Accordingly, Michigan purchasers seek all forms of relief available under Mich. Comp. Laws §445.771, *et seq.*

110.    **Minnesota**. Plaintiff further alleges as follows:

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

competitive levels, the prices at which German Cars were sold in Minnesota.

(b)      Defendants' combinations or conspiracies had the following effects: (1) price competition for German Cars was restrained, suppressed and eliminated throughout Minnesota; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; and (3) Minnesota purchasers paid supracompetitive, artificially inflated prices for German Cars.

(c)      During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

(d)      As a direct and proximate result of Defendants' unlawful conduct, Minnesota purchasers have been injured in their business and property and are threatened with further injury.

(e)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minn. Stat. §325D.50, *et seq*. Accordingly, Minnesota purchasers seek all forms of relief available under Minn. Stat. §325D.50, *et seq*.

111.      **Mississippi**. Plaintiff further alleges as follows:

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in Mississippi.

(b)      Defendants' combinations or conspiracies had the following effects: (1) price competition for German Cars was restrained, suppressed and eliminated throughout Mississippi; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; and

(3) Mississippi purchasers paid supracompetitive, artificially inflated prices for German Cars.

(c)      During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(d)      As a direct and proximate result of Defendants' unlawful conduct, Mississippi purchasers have been injured in their business and property and are threatened with further injury.

(e)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Miss. Code §75-21-1, *et seq*. Accordingly, Mississippi purchasers seek all forms of relief available under Miss. Code §75-21-1, *et seq*.

112.    **Nevada**. Plaintiff further alleges as follows:

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold, distributed or obtained in Nevada.

(b)      Defendants' combinations or conspiracies had the following effects: (1) price competition for German Cars was restrained, suppressed and eliminated throughout Nevada; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; and (3) Nevada purchasers paid supracompetitive, artificially inflated prices for German Cars.

(c)      During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(d)      As a direct and proximate result of Defendants' unlawful conduct, Nevada purchasers have been injured in their business and property and are threatened with further injury.

(e)      By reason of the foregoing, Defendants have entered into agreements

in restraint of trade in violation of Nev. Rev. Stat. §598A, *et seq.*[3] Accordingly, Nevada purchasers seek all forms of relief available under Nev. Rev. Stat. §598A, *et seq.*

113.    **New Mexico**.        Plaintiff further alleges as follows:

(a)        Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in New Mexico.

(b)        Defendants' combinations or conspiracies had the following effects: (1) price competition for German Cars was restrained, suppressed and eliminated throughout New Mexico; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; and

(3) New Mexico purchasers paid supracompetitive, artificially inflated prices for German Cars.

(c)        During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(d)        As a direct and proximate result of Defendants' unlawful conduct, New Mexico purchasers have been injured in their business and property and are threatened with further injury.

(e)        By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.M. Stat. §57-1-1, *et seq.* Accordingly, New Mexico purchasers seek all forms of relief available under N.M. Stat. §57-1-1, *et seq.*

114.    **New York**.  Plaintiff further alleges as follows:

(a)        Defendants agreed to, and did in fact, act in restraint of trade or

---

[3] In compliance with the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §598A.210(3), plaintiff gave notice of this complaint to the Nevada Attorney General on or about the date of filing.

commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in New York.

(b)     Defendants' combinations or conspiracies had the following effects: (1) price competition for German Cars was restrained, suppressed and eliminated throughout New York; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; and

(3) New York purchasers paid supracompetitive, artificially inflated prices for German Cars.

(c)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(d)     As a direct and proximate result of Defendants' unlawful conduct, New York purchasers have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.Y. Gen. Bus. Law §340, *et seq*. Accordingly, New York purchasers seek all forms of relief available under N.Y. Gen. Bus. Law §340, *et seq*.[4]

115.    **North Carolina**. Plaintiff further alleges as follows:

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in North Carolina.

(b)                        Defendants' combinations or conspiracies had the following effects: (1) price competition for German Cars was restrained, suppressed and eliminated throughout North Carolina; (2) German Car prices were raised, fixed, maintained and stabilized at

---

[4] In accordance with N.Y. Gen. Bus. Law §340.5, plaintiff gave notice of this complaint to the New York Attorney General on or about the date of filing.

artificially high levels throughout North Carolina; and (3) North Carolina purchasers paid supracompetitive, artificially inflated prices for German Cars.

(c)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

(d)     As a direct and proximate result of Defendants' unlawful conduct, North Carolina purchasers have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.C. Gen. Stat. §75-1, *et seq.* Accordingly, North Carolina purchasers seek all forms of relief available under N.C. Gen. Stat. §75-1, *et seq.*

116.     **North Dakota.** Plaintiff further alleges as follows:

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in North Dakota.

(b)     Defendants' combinations or conspiracies had the following effects: (1) price competition for German Cars was restrained, suppressed and eliminated throughout North Dakota; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; and

(3) North Dakota purchasers paid supracompetitive, artificially inflated prices for German Cars.

(c)     During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce.

(d)     As a direct and proximate result of Defendants' unlawful conduct,

North Dakota purchasers have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.D. Cent. Code §51-08.1-01, *et seq*. Accordingly, North Dakota purchasers seek all forms of relief available under N.D. Cent. Code §51-08.1-01, *et seq*.

117.    **South Dakota**. Plaintiff further alleges as follows:

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in South Dakota.

(b)     Defendants' combinations or conspiracies had the following effects: (1) price competition for German Cars was restrained, suppressed and eliminated throughout South Dakota; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; and
(3) South Dakota purchasers paid supracompetitive, artificially inflated prices for German Cars.

(c)     During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce.

(d)     As a direct and proximate result of Defendants' unlawful conduct, South Dakota purchasers have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of S.D. Codified Laws §37-1-3.1, *et seq*. Accordingly, South Dakota purchasers seek all forms of relief available under S.D. Codified Laws Ann. §37-1-3.1, *et seq*.

118.    **Tennessee**. Plaintiff further alleges as follows:

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in Tennessee.

(b)     Defendants' combinations or conspiracies had the following effects: (1) price competition for German Cars was restrained, suppressed and eliminated throughout Tennessee; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee;

(3) Tennessee purchasers paid supracompetitive, artificially inflated prices for German Cars.

(c)     During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce.

(d)     As a direct and proximate result of Defendants' unlawful conduct, Tennessee purchasers have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tenn. Code Ann. §47-25-101, *et seq*. Accordingly, Tennessee purchasers seek all forms of relief available under Tenn. Code Ann. §47-25-101, *et seq*.

119.    **Vermont**. Plaintiff further alleges as follows:

(a)     Defendants agreed to, and did in fact, act in restraint of trade or

commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in Vermont.

(b)      Defendants' combinations or conspiracies had the following effects:  (1) price competition for German Cars was restrained, suppressed and eliminated throughout Vermont; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; and

(3) Vermont purchasers paid supracompetitive, artificially inflated prices for German Cars.

(c)      During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce.

(d)      As a direct and proximate result of Defendants' unlawful conduct, Vermont purchasers have been injured in their business and property and are threatened with further injury.

(e)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vt. Stat. Ann. tit. 9 §2453, *et seq.* Accordingly, Vermont purchasers seek all forms of relief available under Vt. Stat. Ann. tit. 9 §2453, *et seq.*

120.      **West Virginia**.  Plaintiff further alleges as follows:

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in West Virginia.

(b)      Defendants' combinations or conspiracies had the following effects:  (1) price competition for German Cars was restrained, suppressed and eliminated throughout West Virginia; (2) German Car prices were raised, fixed, maintained and stabilized at

artificially high levels throughout West Virginia;

(3) West Virginia purchasers paid supracompetitive, artificially inflated prices for German

Cars.

        (c)      During the Class Period, Defendants' illegal conduct substantially

affected West Virginia commerce.

        (d)      As a direct and proximate result of Defendants' unlawful conduct,

West Virginia purchasers have been injured in their business and property and are threatened

with further injury.

        (e)      By reason of the foregoing, Defendants have entered into agreements

in restraint of trade in violation of W. Va. Code §47-18-1, *et seq.* Accordingly, West

Virginia purchasers seek all forms of relief available under

W. Va. Code §47-18-1, *et seq.*

    121.    **Wisconsin**. Plaintiff further alleges as follows:

        (a)      Defendants agreed to, and did in fact, act in restraint of trade or

commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

competitive levels, the prices at which German Cars were sold in Wisconsin.

        (b)      Defendants' combinations or conspiracies had the following effects: (1)

price competition for German Cars was restrained, suppressed and eliminated throughout

Wisconsin; (2) German Car prices were raised, fixed, maintained and stabilized at

artificially high levels throughout Wisconsin; (3) Wisconsin purchasers paid

supracompetitive, artificially inflated prices for German Cars.

        (c)      During the Class Period, Defendants' illegal conduct substantially

affected Wisconsin commerce.

(d)     As a direct and proximate result of Defendants' unlawful conduct, Wisconsin purchasers have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisc. Stat. §133.01, *et seq*. Accordingly, Wisconsin purchasers seek all forms of relief available under Wisc. Stat. §133.01, *et seq*.

### COUNT III
### Violation of State Consumer Protection Statutes

122.    Plaintiff hereby incorporates the allegations in this complaint as though fully set forth herein.

123.    **Florida**. Plaintiff further alleges as follows:

(a)     The aforementioned practices by Defendants were and are in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq*.

(b)     Fla. Stat. §501.203(7), defines "[c]onsumer" as "an individual; child, by and through its parent or legal guardian; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; . . . or any other group or combination." Plaintiff and the members of the Classes are "[c]onsumers" within the meaning of Fla. Stat. §501.203(7).

(c)     Fla. Stat. §501.203(8), defines "[t]rade or commerce" as:

[T]he advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

The advertising, soliciting, offering, selling and furnishing of German Cars by Defendants to plaintiff and the members of the Classes is "[t]rade or commerce" within the meaning of Fla. Stat. §501.203(8).

(d)     Fla.   Stat.   §501.204(1),   provides   that:   "[u]nfair   methods   of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Defendants' acts as alleged in this complaint are unconscionable, illegal, unfair and/or deceptive.

(e)     The unconscionable, illegal, unfair and deceptive acts and practices of Defendants are violative of the provisions of Florida's Deceptive and Unfair Trade Practices Act. Plaintiff and the members of the Classes have suffered actual damage for which they are entitled to relief pursuant to Fla. Stat. §501.211(2).

(f)     Plaintiff, individually and in his representative capacity, is entitled to recover his reasonable attorneys' fees pursuant to Fla. Stat. §501.2105, upon prevailing in this matter.

124.    **Hawaii**. Plaintiff further alleges as follows:

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in Hawaii.

(b)     The foregoing conduct constitutes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Haw. Rev. Stat. §480-2(a). During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

(c)     Defendants' unlawful conduct had the following effects: (1) price

competition for German Cars was restrained, suppressed and eliminated throughout Hawaii; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout Hawaii; (3) Hawaii purchasers were deprived of free and open competition; and (4) Hawaii purchasers paid supracompetitive artificially inflated prices for German Cars.

(d)     As a direct and proximate result of Defendants' conduct, Hawaii purchasers have been injured and are threatened with further injury.

(e)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. §480-2. Accordingly, Hawaii purchasers seek all relief available under Haw. Rev Stat. §480-1, *et seq.*

125.     **Nebraska**. Plaintiff further alleges as follows:

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold, distributed or obtained in Nebraska.

(b)     The foregoing conduct constitutes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Neb. Rev. Stat. §59-1602.

(c)     During the Class Period, Defendants' illegal conduct substantially affected Nebraska's commerce and consumers.

(d)     Defendants' unlawful conduct had the following effects: (1) price competition for German Cars was restrained, suppressed and eliminated throughout Nebraska; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Nebraska purchasers were deprived of free and open competition;

and (4) Nebraska purchasers paid supracompetitive, artificially inflated prices for German Cars.

(e)     As a direct and proximate result of Defendants' conduct, Nebraska purchasers have been injured and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §59-1601, *et seq.*, and accordingly, Nebraska purchasers seek all relief available under that statute.

126.     **New Mexico**.  Plaintiff further alleges as follows:

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in New Mexico.

(b)     Defendants also took efforts to conceal their agreements from New Mexico purchasers.

(c)     The foregoing conduct constitutes "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce" within the meaning of N.M. Stat. Ann. §57-12-3, in that such conduct resulted in a gross disparity between the value received by New Mexico purchasers and the prices paid by them for German Cars as set forth in N.M. Stat. Ann. §57-12- 2E.

(d)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico's commerce and consumers.

(e)     Defendants' unlawful conduct had the following effects: (1) price competition for German Cars was restrained, suppressed and eliminated throughout New Mexico; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high

levels throughout New Mexico; (3) New Mexico purchasers were deprived of free and open competition; and (4) New Mexico purchasers paid supracompetitive, artificially inflated prices for German Cars.

       (f)      As a direct and proximate result of Defendants' conduct, New Mexico purchasers have been injured and are threatened with further injury.

       (g)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. §57-12-1, *et seq.*, and accordingly, New Mexico purchasers seek all relief available under that statute.

       127.    **New York**.  Plaintiff further alleges as follows:

       (a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in New York.

       (b)      Defendants also took efforts to conceal their agreements from New York purchasers.

       (c)      Defendants' illegal conduct substantially affected New York's commerce and consumers.

       (d)      The conduct of Defendants as described herein constitutes consumer oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law §349, which resulted in consumer injury and had a broad adverse impact on the public at large, and harmed the public interest of the State of New York in an honest marketplace in which economic activity is conducted in a competitive manner.

       (e)      As consumers, New York purchasers were targets of the conspiracy.

(f)     Defendants' secret agreements as described herein were not known to New York purchasers.

(g)     Defendants made public statements about the price of German Cars that Defendants knew would be seen by New York purchasers; such statements either omitted material information that rendered the statements made materially misleading or affirmatively misrepresented the real cause of price increases for German Cars; and Defendants alone possessed material information that was relevant to consumers, but failed to provide that information.

(h)     Because of Defendants' unlawful trade practices in the State of New York, there was a broad impact on New York purchasers who indirectly purchased German Cars. New York purchasers have been injured because they have paid more for German Cars than they would have paid in the absence of Defendants' unlawful trade acts and practices, and are threatened with further injury.

(i)     Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased German Cars were misled into believing that they were paying a fair price for German Cars, or that the price increases for German Cars were for valid business reasons.

(j)     Defendants knew that their unlawful trade practices with respect to the pricing of German Cars would have an impact on New York purchasers and not just Defendants' direct customers.

(k)     Defendants knew that their unlawful trade practices with respect to the pricing of German Cars would have a broad impact, causing members of the Classes who indirectly purchased German Cars to be injured by paying more for German Cars than they

would have paid in the absence of Defendants' unlawful trade acts and practices.

(l)     During the Class Period, each of the Defendants named herein, directly or indirectly through affiliates they dominated and controlled, manufactured, sold and/or distributed German Cars in New York.

(m)     New York purchasers seek actual damages for their injuries caused by these violations in an amount to be determined at trial.

128.     **North Carolina**. Plaintiff further alleges as follows:

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in North Carolina.

(b)     Defendants also took efforts to conceal their agreements from North Carolina purchasers.

(c)     The conduct of Defendants as described herein constitutes consumer oriented deceptive acts or practices within the meaning of N.C. Gen. Stat. §75-1.1, *et seq.*, which resulted in consumer injury and had a broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina's commerce and consumers.

(e)     Defendants' unlawful conduct had the following effects: (1) German Car price competition was restrained, suppressed and eliminated throughout North Carolina; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) North Carolina purchasers were deprived of free and

open competition; and (4) North Carolina purchasers paid supracompetitive, artificially inflated prices for German Cars.

(f)      As a direct and proximate result of Defendants' conduct, North Carolina purchasers have been injured and are threatened with further injury.

(g)      During the Class Period, each of the Defendants named herein, directly or indirectly through affiliates they dominated and controlled, manufactured, sold and/or distributed German Cars in North Carolina.

(h)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1, *et seq.*, and accordingly, North Carolina purchasers seek all relief available under that statute.

129.    **Vermont**.  Plaintiff further alleges as follows:

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which German Cars were sold in Vermont.

(b)      Defendants deliberately failed to disclose material facts to Vermont purchasers concerning Defendants' unlawful activities and artificially inflated prices for German Cars.  Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence.  Defendants misrepresented to all consumers during the Class Period that prices for Defendants' German Cars were competitive and fair.

(c)      Because of Defendants' unlawful and unscrupulous trade practices in Vermont, Vermont purchasers who indirectly purchased German Cars were misled or deceived into believing that they were paying a fair price for German Cars or that the price

increases for German Cars were for valid business reasons.

(d)     Defendants' unlawful conduct had the following effects: (1) price competition for German Cars was restrained, suppressed and eliminated throughout Vermont; (2) German Car prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Vermont purchasers were deprived of free and open competition; and (4) Vermont purchasers paid supracompetitive, artificially inflated prices for German Cars.

(e)     As a direct and proximate result of Defendants' illegal conduct, Vermont purchasers suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(f)     Defendants' misleading conduct and unconscionable activities constitute unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, §2451, *et seq.*, and accordingly, Vermont purchasers seek all relief available under that statute.

## COUNT IV
## Unjust Enrichment

130.     Plaintiff hereby incorporates the allegations in this complaint as though fully set forth herein.

131.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of German Cars.

132.     Defendants have benefited from their unlawful acts and it would be inequitable

for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by plaintiff and Class members for German Cars.

133.    Plaintiff and the other Class Members conferred a monetary benefit upon the Defendants in the form of payment for the purchase or lease of the Germany Cars.

134.    The Defendants have knowledge of the benefits conferred directly upon it by plaintiff and the other Class members.

135.    Plaintiff and Class members are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and Class members are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the members of the Classes may make claims on a pro rata basis.

136.    Plaintiff brings this claim in the alternative to his other potential remedies at law

### PRAYER FOR RELIEF

Accordingly, Plaintiff respectfully requests that:

A.      The Court determines that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes.

B.      That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed:

(a)     An unreasonable restraint of trade or commerce in violation of §1 of the Sherman Antitrust Act;

(b)     A *per se* violation of §1 of the Sherman Antitrust Act;

(c)     An unlawful combination, trust, agreement, understanding and/or

concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

        (d)     Acts of unjust enrichment by Defendants as set forth herein.

C.     Plaintiff and the members of the Classes recover damages, to the maximum extent allowed under such laws, and that a joint-and-several judgment in favor of plaintiff and the members of the Classes be entered against Defendants in an amount to be trebled to the extent such laws permit.

D.     Plaintiff and the members of the Classes recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them.

E.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from, in any manner, continuing, maintaining or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect.

F.     Plaintiff and the members of the Classes be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment.

G.     Plaintiff and the members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this complaint.

H.      Plaintiff and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law.

I.      Plaintiff and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Date: 9-22-2017

FRIEDMAN, ROSENWASSER & GOLDBAUM, P.A.

By: _____

Keith A. Goldbaum
(Fla. Bar #0475637)
5355 Town Center Road, Suite 801
Boca Raton, FL 33486
P: (561) 395-5511
F: (561) 368-9274
goldboca@aol.com

Irwin B. Levin
Richard E. Shevitz
Scott D. Gilchrist
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
P: (317) 636-6481
F: (317) 636-2593
ilevin@cohenandmalad.com
rshevitz@cohenandmalad.com
sgilchrist@cohenandmalad.com

*Counsel for the Plaintiff*